**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 06 C 4096** |
| | ) | |
| **ROBERT McINTOSH,** | ) | |
| | ) | |
| **Movant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Robert McIntosh, who pled guilty to a narcotics charge and received a 188 month prison sentence, has filed a *pro se* motion under 28 U.S.C. § 2255 to vacate his conviction and sentence. For the reasons stated below, the Court denies four of McIntosh's seven claims but is unable to determine the other three based on the present record.

**Background**

1. **The proceedings in McIntosh's criminal case**

In August 2003, a grand jury indicted McIntosh on charges of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (the latter provision being the "armed career criminal" provision of the firearms laws, which provides for an enhanced sentence); possessing a machine gun, in violation of 18 U.S.C. § 922(o)(1); and distributing more than five grams of "mixtures containing cocaine base," in violation of 21 U.S.C. § 841(a)(1). *United States v. McIntosh,* No. 03 CR 742 (N.D. Ill.).

McIntosh pled guilty in March 2004 to distributing over five grams of cocaine base,

pursuant to a written plea agreement. The factual basis for the guilty plea was recited in the plea agreement, and McIntosh orally reaffirmed its accuracy when he entered his guilty plea. *See* Mar. 31, 2004 Tr. at 18-19. In the plea agreement, McIntosh stated that in July 2003, he negotiated with an informant on several occasions to exchange what the plea agreement described as "crack cocaine" for hand grenades and a machine gun. *See* Gov't Resp., Ex. A (Plea Agr.) ¶ 5. On July 30, 2003, McIntosh met with the informant, who introduced McIntosh to an undercover law enforcement agent. The undercover agent displayed a machine gun and a hand grenade, and McIntosh handed the agent a plastic bag containing 18.7 grams of "cocaine base." *Id.*

In the plea agreement, McIntosh also stipulated to other "relevant conduct" that he agreed could be considered for purposes of sentencing. The plea agreement stated that on two occasions in July 2003, McIntosh had distributed a total of 10.3 grams of "crack cocaine" to the informant in return for $760. *Id.* ¶ 6. In sum, the plea agreement provided, "[t]he aggregate amount of cocaine involved in the conduct described in Paragraphs 5 and 6 is approximately 29.0 grams." *Id.*

McIntosh stipulated in the plea agreement that the base offense level was 28, representing his responsibility for between 20 and 35 grams of "cocaine base," and that the offense level should be increased by two levels because a firearm was possessed in connection with the offense. McIntosh also stipulated to several prior convictions and to the fact that he was a criminal history category VI offender under the Sentencing Guidelines. The plea agreement also contained a stipulation that McIntosh was a "career offender" pursuant to Sentencing Guidelines section 4B1.1 based on the offense of conviction and his two prior controlled substance

distribution convictions, thereby increasing the offense level to 34. Finally, the plea agreement contained a stipulation that McIntosh was entitled to a three level reduction in the offense level due to acceptance of responsibility.

In the presentence report prepared by the Probation Office, the probation officer agreed with the parties' stipulations and recommended that the Court find the total offense level under the Sentencing Guidelines to be 31 and McIntosh to be a criminal history category offender. This produced a sentencing range of 188 to 235 months.

At the sentencing hearing on August 2, 2005, McIntosh gave a lengthy allocution in which he admitted that he had been dealing drugs for a long time but stated, in substance, that he had been importuned by the government's informant to engage in a drugs-for-weapons deal. He also said that the government could have arrested him for drug dealing much earlier but had not done so because it wanted to make a case involving a drugs-for-weapons deal. He stated that he was "taking responsibility" but claimed that the government had "crossed the line" and had "assisted me" in the drugs-for-guns deal by putting the guns into his car when the exchange was made. He also stated that he "felt threatened" when the deal was going down, suggesting that was why he had gone ahead to complete the deal.

The Court sentenced McIntosh to 188 months. The Court said that it was "sorely tempt[ed]" to deny McIntosh credit for acceptance of responsibility but declined to do so, saying that he had "accepted responsibility, although by about a hair." Aug. 5, 2005 Tr. at 36-37. The Court ordered that the entire sentence was to be served consecutively to a sentence of 131 months imposed by Judge Ronald Guzman in a narcotics case, pointing out that the two cases were "completely separate" and that McIntosh had engaged in the drugs-for-weapons transaction

as he was "literally almost about to get on the bus to go to . . . prison" in the earlier case.  *Id.* at 38.

McIntosh did not file a notice of appeal from the judgment of conviction.

**2.      McIntosh's section 2255 motion**

**a.      McIntosh's claims**

On July 27, 2006, McIntosh filed a *pro se* motion under 28 U.S.C. § 2255 seeking to vacate his conviction and sentence, arguing that his attorney John Meyer failed to provide him with effective assistance of counsel in violation of his Sixth Amendment rights.  In a memorandum accompanying his motion, McIntosh made several contentions in support of his motion.  First, he argued, Meyer failed to tell him that he was not an "armed career criminal" and that § 924(e) thus did not apply to him.  Second, he said, Meyer presented him with a draft plea agreement that classified him as an armed career offender, which McIntosh says was "intimidating" but which he nonetheless turned down.  Third, McIntosh argued, when he signed the plea agreement that was ultimately filed with the Court, he did so under the assumption that he was admitting to a charge involving "cocaine base," not "crack cocaine."  Fourth, McIntosh alleged, Meyer filed a motion to withdraw that did not include sufficient grounds and was therefore denied.  Fifth, McIntosh said, Meyer "abandoned" him at the sentencing hearing and did not speak on his behalf.  Sixth, McIntosh contended, Meyer failed to request an evidentiary hearing on the question of whether the narcotics were actually crack cocaine.  Seventh, he alleged, he wrote to Meyer asking him "to reserve his rights on appeal" but that Meyer failed to do so.  McIntosh Mem. (filed July 27, 2006) at 4-5.

**b.      The government's response and trial counsel's affidavit**

The government responded to McIntosh's motion, arguing that he had asserted no meritorious grounds for relief under section 2255. With its response, the government submitted an affidavit from attorney Meyer, who stated the following. After receiving the presentence report, he reviewed the records of McIntosh's prior convictions and determined that one of his earlier narcotics convictions was for a possession offense, not a delivery offense. Gov't Resp., Ex. C ¶ 2. As a result, Meyer concluded, McIntosh was not a "career offender" and had been incorrectly classified as such at sentencing in the earlier case before Judge Guzman. *Id.* He assisted McIntosh in preparing a section 2255 motion for that case, and as a result, Judge Guzman resentenced McIntosh to a lower prison term. *Id.* Meyer also stated that he advised McIntosh that he was not an "armed career criminal" for purposes of his case before this Court, but that because he had two prior controlled substances offenses, he was still a "career offender" under the Sentencing Guidelines. *Id.* ¶ 3. This point was discovered prior to the entry of the plea agreement in the present case. *Id.*

Meyer also stated that before sentencing in the present case, he advised McIntosh of his right to appeal and the issues that might be raised, and that McIntosh said he did not wish to pursue an appeal. *Id.* ¶ 4. He discussed the matter with McIntosh again immediately after the sentencing on August 2, 2005, and McIntosh again stated that he did not wish to appeal. *Id.* ¶ 5. On August 9, 2005, Meyer said, he received a letter from McIntosh, in which McIntosh said "I would like for you to file the motion to extend the time of filing an appeal because it might become useful in the near future." *Id.,* first attached exhibit. Meyer sent McIntosh a letter in response, dated August 9, 2005, in which he advised that McIntosh's stated grounds were not a basis to seek an extension of time to appeal. He reminded McIntosh that he had previously

stated that he did not want to appeal. He also advised McIntosh that because "there is a ten-day period following the imposition of sentence within which to file a notice of appeal, you should notify me immediately if that is what you wish to do and I will file a notice of appeal. You can either write me or call me collect at the above telephone number." *Id.,* second attached exhibit. In his affidavit, Meyer stated that he received neither a written response nor a telephone call from McIntosh in response to his August 9 letter. *Id.* ¶ 6. Meyer stated that he has always had the same telephone number and has two incoming telephone lines, both of which were working throughout 2005, and that he did not recall experiencing any problems with the lines or hearing clients complain about getting a busy signal during that year. *Id.* ¶ 7.

Meyer's affidavit does not address the "crack" / "cocaine base" issue asserted by McIntosh in his section 2255 motion and supporting memorandum.

### c.     McIntosh's reply and affidavit

McIntosh submitted his own affidavit along with his reply to the government's response. In his affidavit, he stated that Meyer had presented two draft plea agreements to him. The first classified him as an armed career criminal (which McIntosh incorrectly describes as "armed career offender" status), and the second described him as a career criminal. McIntosh Aff. ¶ 3. He stated that it was not until after he signed a plea agreement that he realized that the armed career criminal law did not apply to him. *Id.* ¶ 4. He stated that if Meyer had properly informed him that the indictment's armed career criminal allegation did not apply before he presented the draft plea agreement that included an armed career criminal finding, "I could have *possibly* signed to [a plea agreement] to count one for the 922(g)(1) [charge], which carries a maximum of 120 months imprisonment," rather than the plea agreement on the narcotics charge

that he ultimately signed, which provides for a higher maximum penalty. *Id.* ¶ 5 (emphasis added).

McIntosh also stated in his affidavit that he believed he signed a plea agreement admitting to "cocaine base" and that Meyer had never explained the stipulation to additional distribution of "crack." *Id.* ¶¶ 6-7. He stated that once he discovered he had agreed to a provision involving "crack," he advised the Court that he had no intention of admitting to distributing crack and that he would not have signed the plea agreement had he been aware of this. *Id.* ¶ 8. He said that at the same hearing, he "stated several cases in my defense" and sought a lesser sentence than a sentence based on "crack," but that Meyer did nothing to assist him. *Id.* ¶ 9.[1]

McIntosh also stated in his affidavit that after receiving Meyer's August 9 letter asking McIntosh to call or write if he wished to appeal, "I tried to notify Mr. Meyer but had no stamps or stamped envelope to write him back, to let him know to file my appeal, also the Dodge County jail never passed out stamps or stamped envelope[s] while I was in the County Jail." *Id.* ¶ 13. He stated that "I also tried calling [Meyer] collect but could not get through because of a continuing busy signal due to phone difficulties, which I can not say what end of the phone line was having the problem." *Id.* McIntosh did not indicate when, or how many times, he attempted to call Meyer.

---

[1] McIntosh says these events took place on June 2, 2005, and for that reason he has asked the Court to stay its decision in this case so the transcript of proceedings on that date can be obtained. The Court has carefully reviewed the transcript of the August 2, 2005 sentencing, and it is clear that it contains the discussion that McIntosh thinks occurred earlier. On August 2, 2005, McIntosh told the Court that he had not wanted to admit to "crack" and, as he puts it in his affidavit, "stated several cases in [his] defense." *See* Aug. 2, 2005 Tr. at 5-6, 7, 8.

**Discussion**

To sustain a claim of ineffective assistance of counsel, McIntosh must demonstrate that his counsel's performance fell below an objective standard of reasonableness and caused him prejudice in that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 687-88, 694 (1984). On the issue of prejudice, to the extent that McIntosh's claims involve his decision to plead guilty, he must show there is a reasonable probability that, but for counsel's errors, he "'would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1995). To the extent that McIntosh's claims involve counsel's performance regarding sentencing, he must show there is a reasonable probability that counsel's actions or inactions resulted in a sentence higher than he otherwise would have received. *See Glover v. United States,* 531 U.S. 198, 200, 203 (2001).

**1.      Claims one and two - armed career criminal allegation**

As to the first two claims in McIntosh's motion, McIntosh has failed to show that the indictment's erroneous classification of him as an armed career criminal, or his lawyer's alleged failure to advise him of this, prejudiced him in any way. First of all, McIntosh's guilty plea did not involve the firearms charges and did not include a stipulation to armed career criminal status. Secondly, as the government has noted, it was attorney Meyer who discovered that McIntosh did not, in fact, qualify as an armed career criminal. McIntosh does not contend, and certainly has not shown, that a perceived risk of armed career criminal status impacted in any way his decision to plead guilty. His claim that he would have tried to negotiate for a guilty plea to a charge other than the narcotics charge is insufficient to entitle him to relief. As the government points out, it

is entirely speculative that the government would have been willing to agree to a plea to some other charge. In any event, "a claim that a defendant would not have entered *this particular plea agreement* is not sufficient to show prejudice." *Bethel v. United States,* 458 F.3d 711, 720 (7th Cir. 2006) (emphasis added).

**2.      Claim three - identification of narcotics in plea agreement**

McIntosh's third claim is that he thought he was entering into a plea agreement involving "cocaine base," not "crack cocaine." "All crack is cocaine base but not all cocaine base is crack." *United States v. Edwards,* 397 F.3d 570, 571 (7th Cir. 2005). The statute under which McIntosh was prosecuted makes it a crime to distribute cocaine base. The Seventh Circuit has held, however, that in enacting the statute, Congress intended the term cocaine base to mean only crack cocaine, not other forms of cocaine base. *Id.* at 571-72; *see also, United States v. Booker,* 70 F.3d 488, 494 (7th Cir. 1995). The same is true of the corresponding provision of the Sentencing Guidelines. *Id.* at 571; *see* U.S.S.G. § 2D1.1(c), app. note D.

McIntosh's contention in his affidavit that he did not intend to enter into a plea agreement involving "crack cocaine" is somewhat hard to swallow, as that term appears at several points in the plea agreement's description of the factual basis for the plea and its description of the additional criminal conduct to which McIntosh stipulated for purposes of sentencing. Specifically, in the factual basis for his guilty plea, McIntosh admitted that prior to July 30, 2003, he had discussed with "individual A" "the purchase of a machine gun and a hand grenade in exchange for crack cocaine." Gov't Resp., Ex. A ¶ 5. He also admitted that on July 28, 2003, he "discussed the exchange of crack cocaine for one machinegun [sic] and five hand grenades." *Id.* In the section involving other relevant criminal conduct, McIntosh admitted that

on July 10, 2003, he discussed "the purchase of crack cocaine" with individual A, with a price of $360 for "36 individually wrapped bags of crack cocaine." *Id.* ¶ 6. He also admitted that on July 22, 2003, he met individual A "for the purchase of additional crack cocaine," and that he transferred to individual A "36 individually wrapped bags of crack cocaine." *Id.* ¶ 6.

On the other hand, McIntosh pled guilty to actual distribution of narcotics on July 30, 2003, not to conspiracy or to distribution of narcotics on the earlier dates. Thus the relevant question is what he actually distributed in exchange for the weapons. Though the plea agreement included a stipulation to other relevant conduct that plainly and unambiguously involved distribution of more than 5 grams of crack, the statutory maximum sentence, as the Court understands it, is determined by reference to the offense of conviction, not other relevant conduct that may be considered for purposes of sentencing.

The plea agreement was rather inconsistent in its description of the narcotics that McIntosh dealt on July 30, 2003. In the section describing the factual basis for the guilty plea to the charge of distribution on July 30, 2003, in addition to the two above-quoted references to "crack cocaine," the plea agreement described the substance involved twice as "cocaine base" and once as "cocaine." *Id.* ¶ 5. Finally, when the plea agreement described the total amount of narcotics that McIntosh admitted distributing, it stated that "[t]he aggregate amount of cocaine involved in the conduct described in Paragraphs 5 and 6 is approximately 29.0 grams." *Id.* And at the guilty plea hearing, when the prosecutor verbally described the factual basis, he used only the term "cocaine base," not the term "crack cocaine." Mar. 31, 2004 Tr. at 20-21.

The plea agreement represents something less than a model of careful drafting by the prosecutor and defense counsel, and the government's verbal description of the factual basis at

the guilty plea hearing did not improve things. The Court likewise should have caught the potential for a problem and cleared up any ambiguity at the time.

The bottom line, however, is that McIntosh does not state that he would not have pled guilty if the plea agreement had consistently and unambiguously referred to "crack cocaine." Indeed, prior to being sentenced, McIntosh called this very same issue to the Court's attention but specifically disavowed any intention to do anything other than plead guilty. Early during his sentencing hearing on August 2, 2005, McIntosh told the Court that the difference between cocaine base and crack cocaine had not been explained to him. Aug. 2, 2005 Tr. at 5-6. He stated that "everything else in my plea just state[s] cocaine base . . . except for [the] relevant conduct [section]." *Id.* at 6. The Court held an extended discussion with McIntosh about what he understood and intended at the time he pled guilty. *Id.* at 6-9. At the conclusion of the discussion, the Court asked McIntosh directly: "You know, what are you asking me? Are you saying you want to withdraw your guilty plea?" McIntosh immediately stated, "No, your honor." *Id.* at 8-9. Under the circumstances, McIntosh's third claim is lacking in merit, as he cannot make the necessary showing of prejudice with regard to his decision to plead guilty. Specifically, in light of his statement to the Court on August 2, 2005, McIntosh cannot show that but for counsel's alleged errors in explaining the plea agreement to him, he "would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59.

### 3. Claim four - trial counsel's motion to withdraw

McIntosh's fourth claim is that Meyer did not do a good enough job in explaining to the Court why McIntosh wanted to terminate his services. The record of the in-court discussion regarding the motion reflects, however, that McIntosh himself was given a full opportunity to

explain any problems he had with Meyer's representation.  At the conclusion of the discussion, the Court denied the motion.  *See* Gov't Resp., Ex. B (Apr. 7, 2005 Tr.) at 2-14.  McIntosh does not identify anything Meyer could have said that might have altered the Court's ruling, and he does not claim that this affected his decision to plead guilty or his sentence.  Again, McIntosh has failed to make a showing of prejudice.

**5.      Claims five and six - trial counsel's treatment of the "cocaine base" / "crack" issue**

McIntosh's fifth and sixth claims concern Meyer's performance in connection with the cocaine base / crack issue as it relates to sentencing.  McIntosh's fifth claim is that Meyer did not argue at sentencing that McIntosh should receive a sentence based in whole or in part on non-crack cocaine base.  His sixth claim is that Meyer should have submitted the controlled substances at issue in the indictment for testing to determine their composition, in order to assist in arguing that the substance was not crack.  McIntosh Mem. at 5 (denominating these as his fourth and fifth claims).

The government contends that these claims present a simple issue and that McIntosh could not possibly have been prejudiced by Meyer's actions or inaction.  The government essentially takes the position that it does not matter whether the substance was crack or a non-crack form of cocaine base.  According to the government, because McIntosh was categorized as a career offender under Sentencing Guidelines section 4B1.1, "any crack / cocaine base issue was of no import."  Gov't Resp. at 8.  Specifically, the government argues, due to his career offender status, McIntosh's Guideline sentencing range was determined based on the statutory maximum applied to offenses involving more than five grams of cocaine base under 21 U.S.C. § 841(a)(1), which, the government says, was forty years.

13

It is not quite that simple. To explain, some background is required. As the government notes, when a defendant is (like McIntosh) a career offender within the meaning of the Sentencing Guidelines, the base offense level depends on the maximum penalty for the offense of conviction. *See* U.S.S.G. § 4B1.1. In McIntosh's case, the Court and the parties operated on the belief that his base offense level to be 34. The reason for this was that everyone understood or assumed that the offense of conviction carried a statutory maximum penalty of 40 years. *See* Gov't Resp., Ex. A ¶¶ 7(k) & 9. Whenever the statutory maximum for the offense of conviction is 25 years or more, the base offense level is 34. *See* § 4B1.1(b).

The problem is that the arguable ambiguity in the plea agreement's description of the narcotics involved in the distribution offense to which McIntosh pled guilty could be argued to affect the statutory maximum for that offense and thus to affect the base offense level under the career offender guideline. The maximum penalty for an offense involving 5 grams or more of a substance containing cocaine base is, in fact, 40 years. 21 U.S.C. § 841(b)(1)(B)(iii). But as the Court has noted, the Seventh Circuit has made it clear that § 841(a)(1)'s reference to cocaine base actually means crack, stating definitively that "the enhanced penalties for cocaine base in the Guidelines *and* the statutes 'apply to crack cocaine, and the lesser penalties apply to all other forms of cocaine.'" *Edwards,* 397 F.3d at 575 (quoting *Booker,* 70 F.3d at 488 (emphasis original in *Booker*)). Thus if a person distributes 5 grams or more, but less than 500 grams, of a form of cocaine base other than crack, the maximum penalty is 20 years, not 40. *Id.* § 841(b)(1)(C). Under the career offender guideline, the base offense level for a defendant whose offense of conviction is 20 years is 32, not 34 as the Court applied in McIntosh's case. *See* U.S.S.G. § 4B1.1(b).

The plea agreement described the substance that McIntosh distributed on July 30, 2003 as "18.7 grams of cocaine base." Gov't Resp., Ex. A ¶ 5. Without giving consideration to anything other than what the plea agreement states, McIntosh potentially could have argued that the agreement did not establish that he distributed crack and that his base offense level was 32, not 34.

The government makes no other argument other than the one the Court has just discussed for why defense counsel's failure to argue the cocaine base / crack issue did not prejudice McIntosh. The Court has, however, considered another way in which the offense statutory maximum would have been 25 years or more and that, therefore, the base offense level would not have been affected by the plea agreement's arguable ambiguity regarding the substance that McIntosh distributed on July 30, 2003. Specifically, even if the substance distributed was between 5 and 500 grams of a non-crack form of cocaine base, the law imposes a statutory maximum of 30 years if a person distributes that substance "after a prior conviction for a felony drug offense has become final." 21 U.S.C. § 841(b)(1)(C). Based on the presentence report, McIntosh had two prior convictions for felony drug offenses, specifically, a 1990 conviction for possession of a controlled substance and a 1991 conviction for delivery of a controlled substance. *See* Case No. 03 CR 742, Presentence Report at 6-7. The problem, however, is that § 841's enhanced penalties for persons with prior convictions cannot be imposed "unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). The docket in McIntosh's criminal case does not reflect that the government filed an information under section

851 prior to McIntosh's entry of a guilty plea. Thus at sentencing, McIntosh was not subject to the higher penalties imposed on persons who violate section 841 after having been convicted of a felony drug offense.

In short, the arguable ambiguities in the plea agreement's identification of the substance that McIntosh distributed on July 30, 2003 might have permitted a contention that, for sentencing purposes, the substance should be considered as non-crack cocaine base for sentencing purposes. *See, e.g., United States v. Garrett,* 189 F.3d 610, 612 (7th Cir. 1999) (vacating sentence of defendant where factual basis for guilty plea referred to "cocaine base" and it was unclear whether evidence established that substance was crack). If the offense of conviction actually involved 5 grams of a non-crack form of cocaine base or simple cocaine, the 40 year statutory maximum did not actually apply, and McIntosh's offense level and resulting sentencing range would have been lower. Though it is certainly possible that the Court would have imposed the same sentence anyway under that scenario, the Court cannot make that determination in the present procedural context.

The Court now returns to McIntosh's fifth and sixth claims. He contends that Meyer should have submitted the substance for testing (claim 7) and should have argued at sentencing that the substance was not crack (claim 6). The Court cannot rule on these claims based on the briefs that the parties have submitted. Meyer's failure to take these steps may well have represented a reasonable judgment on his part, and it may not have prejudiced McIntosh in any event. As noted earlier, however, the affidavit from Meyer submitted by the government does not address these points, and the government has submitted no other evidence regarding the nature of the substance. Based on the record before the Court, the Court cannot determine either

16

that Meyer made a reasonable professional judgment not to argue the issue at sentencing, or that McIntosh was not prejudiced in the determination of his sentence.

The same is true with respect to McIntosh's claim that Meyer rendered ineffective assistance by failing to have the substance tested to determine its composition. Because the record contains no evidence that would allow the Court to determine that such a test would have been unhelpful or futile, the Court cannot determine at this time that Meyer made a reasonable professional judgment not to request testing of the substance or that McIntosh was not prejudiced by the failure to have it tested. Further proceedings will be required on both of these claims.

**6.      Claim seven - non-filing of notice of appeal**

McIntosh's seventh and final claim is that Meyer failed to file a notice of appeal. Determination of a claim that counsel rendered ineffective assistance by failing to file a notice of appeal involves a two part inquiry: whether counsel consulted with the defendant about an appeal, and if not, whether counsel's failure to do so constituted deficient performance. *Roe v. Flores-Ortega,* 528 U.S. 470, 478-79 (2000). The defendant must also "demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he could have timely appealed." *Id.* at 484. To obtain an evidentiary hearing on such a claim, and ultimately to obtain relief, a defendant must make more than bare allegations about the lawyer; supporting evidence is required. *See, e. g., Galbraith v. United States,* 313 F.3d 1001, 1008 (7th Cir. 2002); *Bruce v. United States,* 256 F.3d 592, 597 (7th Cir. 2001).

Under *Flores-Ortega,* counsel has am obligation to consult with the defendant about an appeal "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular

defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega,* 528 U.S. at 480. In this case, McIntosh does not dispute that Meyer consulted with him both before and after sentencing about an appeal, and he does not dispute Meyer's statement that he said he did not wish to pursue an appeal. "[A] defendant who explicitly tells his attorney not to file an appeal plainly cannot later complain that, by following his instruction, his counsel performed deficiently." *Id.* at 477.

McIntosh contends, however, that several days after the sentencing hearing, while there was still time to file an appeal, he expressed an interest in appealing and that Meyer more or less rebuffed him. As indicated earlier, McIntosh wrote Meyer on August 4, 2005, two days after the sentencing hearing, to state that "I would like for you to file the motion to extend the time of filing an appeal because it might become useful in the near future." Gov't Resp., Ex. C, first attached exhibit. Though the Court hesitates to draw any inference from the specific wording of this request, McIntosh's reference to "*the* motion to extend the time of filing an appeal" might be understood to refer back to some earlier discussion that he and Meyer had about the topic.

In any event, Meyer promptly responded to McIntosh's letter, sending him a letter on August 9, 2005. Meyer referred McIntosh to their discussions before and after sentencing in which "you informed me that you did not wish that a notice of appeal be filed." *Id.,* second attached exhibit. Meyer acknowledged McIntosh's request to move for an extension of time to appeal but stated that "I cannot file a motion to extend the time for filing a notice of appeal because you feel it might become useful in the future." *Id.* He told McIntosh that if he wished actually to appeal, he should advise Meyer in writing or by collect telephone call, and Meyer would file a notice of appeal. *Id.*

McIntosh's request was, at best, ambiguous on the question of whether he wanted to appeal: he did not tell Meyer that he wanted to appeal, only that he wanted more time to make a decision. Though Meyer cannot be faulted for asking McIntosh to clarify whether he actually wanted to appeal, one reasonably might question his rebuff of McIntosh's request to ask for an extension. Under the Federal Rules of Appellate Procedure, a district court may extend the time to file a notice of appeal if, within certain time constraints not relevant in this case, the party seeking to appeal "shows excusable neglect or good cause." Fed. R. App. P. 4(a)(5)(A)(ii). One could not determine from McIntosh's letter alone whether he could make a showing of "good cause"; further inquiry was necessary. However, Meyer did not ask McIntosh to clarify why he wanted an extension of time; rather, he simply told McIntosh that he had to make a decision within the time allotted whether to appeal, or not.

McIntosh says that after receiving Meyer's letter, he intended to write or call Meyer to ask him to file a notice of appeal, but he could not obtain a postage stamp and, for reasons unknown, could not get through to Meyer's office by telephone. The former point cannot be laid at Meyer's feet, but the Court cannot rule out at this stage of the proceedings the possibility that a detention facility's policies or practices regarding obtaining postage might constitute a constitutional violation that would entitle a defendant to relief in a section 2255 proceeding.[2] On

---

[2] The government attached to its response to McIntosh's motion a program statement from the Bureau of Prisons regarding how an inmate who has no funds can obtain postage to send correspondence to an attorney or a court. *See* Gov't Resp., Ex. E. But the Bureau of Prisons did not have custody of McIntosh at the relevant time; he was in the custody of the Marshal, which had (and still has) a contract with the Dodge County, Wisconsin jail and other similar outlying facilities to house detainees for whom there is no room at the Chicago Metropolitan Correctional Center. The relevant policies in this regard, if any, would be those of the Dodge County jail and/or the Marshal. The government has not made either of those entities' policies part of the record in this case.

the latter point, the record as it currently exists does not allow the Court to determine that McIntosh's inability to reach Meyer by telephone did not result from some failure on Meyer's end. In this regard, Meyer's statement that he did not hear from any clients during the relevant period that they were having trouble reaching him is significant but not outcome-determinative. Further proceedings will be required before the Court can decide McIntosh's claim.

Though most cases involving trial counsel's alleged failure to file a notice of appeal involve situations in which the defendant claims to have actually communicated to counsel to appeal, one recent case is different. In *Corral v. United States,* ___ F.3d ___, 2007 WL 2296520 (7th Cir. Aug. 13, 2007), the court reversed the denial of section 2255 relief in a case in which, after the defendant initially said he did not wish to appeal, trial counsel essentially made himself unavailable, preventing the defendant from communicating his newly-determined wish to appeal. In this regard, the court rejected the district court's conclusion that there was no support "for the argument . . . that an attorney has a duty to be reachable by his client" during the period following sentencing. *Id.,* at *3. It then examined "whether the attorney remained reasonably available" to the defendant during the period in which an appeal could be filed, concluding that counsel had failed to be reasonably available. *Id.,* at *4. In the present case, there is no hint, and the Court does not intend to suggest, that Meyer (unlike the attorney in *Corral*) took any affirmative steps to avoid McIntosh. However, the Seventh Circuit's extension of *Flores-Ortega* to cases in which the defendant attempted to communicate an intention to appeal but never succeeded in reaching counsel suggests that further inquiry may be required before the Court can determine McIntosh's seventh claim.

With regard to McIntosh's fifth, sixth, and seventh claims, the Court does not now

determine that an evidentiary hearing is required. Rather, the Court will give the parties the opportunity to make a further evidentiary submission on these claims, on the schedule to be set forth below. The Court will thereafter determine whether an evidentiary hearing is required.

### Conclusion

For the reasons stated above, the Court denies McIntosh's section 2255 motion [docket no. 1] as to what the Court has characterized as McIntosh's first four claims but defers ruling as to the last three claims. In addition, the Court denies McIntosh's "petition for court to submit additional transcript" [docket no. 26] and his "motion to stay awaiting court reporter" [docket no. 28] because the transcript in question is unnecessary to determination of the matters addressed in this decision. The Court previously ruled on the government's motion for an order authorizing disclosure of attorney-client communications [docket no. 8] and therefore directs the Clerk to terminate that motion. The government's additional evidentiary submission, if any, is to be filed by September 21, 2007, and McIntosh's additional evidentiary submission, if any, is to be filed by October 17, 2007. The Court will thereafter determine whether an evidentiary hearing will be required.


MATTHEW F. KENNELLY
United States District Judge

Date:   August 27, 2007

21